UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Lenny Shoultz                                    Civil No. 04-1566 (JRT/FLN)

       Plaintiff,

    v.                                           **REPORT AND RECOMMENDATION**

Jo Ann B. Barnhart,
Commissioner of Social Security,

       Defendant.

_____

Lionel H. Peabody, for Plaintiff.
Lonnie F. Bryan, Assistant United States Attorney, for Defendant.

_____

Plaintiff Lenny Shoultz seeks judicial review of the final decision of the Commissioner of Social Security, who denied his application for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 405(g). This Court has appellate jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1(c). The parties have submitted cross-motions for summary judgment [#8; #12]. For the reasons which follow, this Court recommends the Commissioner's decision be reversed and the case remanded for further administrative proceedings consistent with this Report and Recommendation.

## I.  INTRODUCTION

Plaintiff Lenny Shoultz applied for DIB and SSI on April 10, 2002, alleging a disability onset date of November 25, 2001. (T. 52-55). The Social Security Administration denied the applications

initially and on reconsideration.  (T. 24-32, 35-37).  Plaintiff filed a timely request for a hearing,

which was held before the Administrative Law Judge ("ALJ") Michael D. Quayle on July 23, 2003.

(T. 418-50).  The ALJ rendered an unfavorable decision on October 20, 2003.  The ALJ determined

that Plaintiff was not disabled under the Social Security Act because he was able to perform jobs

available in significant numbers in the national economy.  (T.  21).  Plaintiff appealed this decision

to the Appeals Council, which denied review on March 3, 2004, making the decision of the ALJ the

final decision of the Commissioner.  (T. 7-10).

Plaintiff initiated this action seeking judicial review on April 13, 2004. [#1].  He moved for

Summary Judgment on September 20, 2004. [#8].  He raises the following issues in his Motion: 1)

whether the ALJ properly weighed the physician opinions in the record; 2) whether the ALJ failed

to consider the effect of Plaintiff's mental impairments in assessing his credibility; and 3) whether

the ALJ failed to follow the <u>Polaski</u> requirements in assessing Plaintiff's credibility.

## II.  STATEMENT OF FACTS

### A.      Background

Plaintiff was born in 1963, and was age 39 at the time of the administrative hearing.  (T. 53;

421).  Plaintiff has an eighth-grade education and previously worked as a transmission mechanic,

delivery driver, and dishwasher.  (T. 69, 76, 122).  He claims disability as of November 25, 2001,

because of a torn ligament in his right hip, a neck injury with compressed vertebrae, migraine

headaches, muscle spasms, subluxation of the spine, and depression.  (T. 63).  He alleges some of

these problems first arose in 1991.  <u>Id.</u>

### B.      Medical Evidence - Physical Impairments

#### 1.      Plaintiff's 1991 Head Injury and Resulting Headaches

a.      Dr. Golden

In March 1991, Plaintiff suffered a work-related injury when he struck his head when he attempted to stand under a car.  (T. 362).  He sustained a compression injury to the neck and a closed head injury.  (Id.).  On May 7, 1991, Plaintiff reported to Richard Golden, M.D., at the Noran Neurological Clinic, that he continued to suffer headaches, neck pain, and radiation into the arms. (Id.).  Dr. Golden diagnosed Plaintiff as suffering from a concussive syndrome.  (T. 161).

In July 1991, Plaintiff reported to Dr. Golden that he suffered insomnia and disabling headaches, associated with photophobia and nausea, every two to eight hours.  (T. 359-60).  Dr. Golden saw Plaintiff again in August and September, 1991.  Despite being prescribed numerous medications for his headaches, neck inflamation and insomnia, Plaintiff's symptoms had improved only somewhat.  (See T. 355-58).  On October 24, 1991, Dr. Golden noted that as a result of his injury, Plaintiff had difficulty with short term memory, and that he had "become extremely frustrated, depressed and very sleep deprived."  Dr. Golden recommended psychological evaluation and counseling because he was "very concerned about [Plaintiff's] mental health."  (T. 354).  In December 1991, Dr. Golden noted that Plaintiff had recently reported twice to the emergency room because of an increase in symptoms, and that he had started a chronic pain program.  He noted that tests had revealed Plaintiff suffered depression, but that the Mellaril and Prozac he was prescribed increased his muscle spasms.  Dr. Golden diagnosed post-traumatic cervical sprain syndrome and brachial plexus irritation.  (T. 352-53).

The record shows that Plaintiff continued to receive treatment for headaches, muscle spasms and numbness in his arm from Dr. Golden and others at the Noran Neurological Clinic until 1995. (See T. 329-364).  In January 1992, Dr. Golden opined that Plaintiff suffered a combination of

vascular and tension headache disorder, and that he did not think "one modality" would be able to cure the headaches because he suffered "so many of them." (T. 351). He noted that Plaintiff was working four hours every other day, and that he was "highly motivated" to manage his symptoms and maintain his work status." (T. 349).

In February 1992, Dr. Golden noted that Plaintiff appeared uncomfortable, fatigued and sleep deprived. He had limited neck mobility, tenderness, brachial plexus signs and decreased sensation in the right hand. (T. 347-48).

Dr. Golden reported in July 1992 that Plaintiff was making slow, steady improvement, and recommended Plaintiff continue his Vicodin and Fioricet prescriptions, and chiropractic and acupuncture therapies. (T. 344).

In August 1992, Dr. Golden reported that Plaintiff was working five hours a day, three days a week. His headaches had increased to three per week on average, but had decreased in intensity. He reported he was frustrated and was experiencing financial difficulty. Dr. Golden noted that Plaintiff appeared depressed. (T. 340).

In September 1994, Plaintiff reported to Nurse Practitioner Dodie Russell at the Noran Neurological Clinic, that he continued to have the same pattern of neck and interscapular pain, and suboccipital headaches associated with nausea approximately two to three times a week. He felt he was steadily improving, although he still had some problems with memory. He took 10-15 Midrin tablets and 4-8 Vicodin a month. (T. 331).

In January 1995, Dr. Golden rated Plaintiff's workability as: "general mobility and endurance ...five to six hours per day with position changes every 30 minutes...light back, neck, and trunk activity, ten to twenty bends per hour, and neck movements...limited to no prolonged

bending." (T. 329).  Dr. Golden stated that Plaintiff was stable and that he did not expect him to improve beyond his current state.  (T. 330).

### b.    Dr. Johnson

The record shows that in 2000, Plaintiff was being treated by Steven Johnson, M.D., for chronic neck and back pain at the Fairview Northland Clinic in Princeton, Minnesota.[1]  (T. 195). Dr. Johnson wrote that Plaintiff called every couple of months for "short courses of anti-inflammatories, anti-spasmodics and Vicodin."  In September 2000, Dr. Johnson diagnosed chronic pain syndrome and referred him to the Medical Advanced Pain Specialists (MAPS) Chronic Pain Clinic.  (T. 194-95).

In February 2001, Plaintiff reported to Dr. Johnson that he had been experiencing more headaches and neck pain, and that he required more Vicodin.  (T. 191).  The record shows that he renewed his prescription for 30 tablets monthly from February 2001 until the administrative hearing in July 2003.  See Pl's Mem. p. 12, n. 2, citing records.

In April 2002, Plaintiff reported to Dr. Johnson that he was suffering multiple migraines a day, and that his pain was 10 on a scale of 10.  (T. 158-59).  He reported going to the emergency room the previous week to receive a shot of Demerol.  He was given a prescription for Imitrex, and a trigger point injection at the base of his neck.

In October 10, 2002, Plaintiff saw Dr. Johnson with aggravated neck pain.  He reported that after an Independent Medical Examination ("IME") conducted in September, he had suffered shooting pain in his shoulders and headaches.  On exam the neck had very limited range of motion, and the upper back muscles were tense, tight and painful.  Dr. Johnson assessed cervical sprain

---

[1]

Dr. Johnson's treatment records prior to July 2000 do not appear in the record.  See Pl. Mem. p. 12 n. 1.

-5-

syndrome. (T. 280-81). In April 2003, Plaintiff reported to Dr. Johnson that he suffered a lot of pain in his neck. Dr. Johnson assessed chronic neck disability and administered a Demerol injection. (T. 376-77).

### c.    Dr. Knafla

The record shows that Plaintiff received chiropractic treatment since his injury in March 1991. (T. 413). In 1995, he began to see Kathryn Knafla, D.C, C.C.S.P. Plaintiff saw Dr. Knafla on 18 occasions from December 2001 to December 2002. (T. 229-35). On March 17, 2003, she completed an assessment of his functional limitations. (T. 236-39). She concluded he was limited to lifting less than 10 pounds on an occasional basis, and that he could not sit or stand more than 2 hours of an 8 hour day. She diagnosed chronic pain, chronic muscle spasms and subluxation, with limited range of motion and positive objective findings. (T. 226). She opined that Plaintiff's ailments would cause him to be absent from work more than three times a month, and that he was not capable of sustaining competitive employment. (T. 226; 239).

### d.    Dr. Dowdle

On September 27, 2002, Plaintiff saw John Dowdle, M.D., an orthopedic surgeon, for an independent medical examination (IME). (T. 405-12). Dr. Dowdle noted that he had no information on Plaintiff's "low back condition or on his hip scan," so he was "unable to comment further on that condition." (T. 411). Dr. Dowdle concluded that Plaintiff had subjective complaints relating to his neck with minimal objective findings. He opined that Plaintiff's "current symptoms and problems are related to his chronic pain syndrome which is not related in any way to his March 4, 1991 injury." (Id.). He concluded that Plaintiff's neck condition required no work restrictions, but that he did not have sufficient information regarding Plaintiff's hip or back to comment whether those

conditions required work restrictions.

### 2.    Plaintiff's Treatment at MAPS

Upon referral by Dr. Johnson, Plaintiff was seen by David Nelson, M.D., at MAPS in June 2001. (T. 141-44).  Dr. Nelson assessed that his "cervicalgia, cervicogenic headaches, and right upper extremity symptoms may have a discogenic, facet-mediated, neuropathic, and myofascial etiology."  He had follow-up appointments with Dr. Nelson on July 6, 2001, July 19, 2001, and July 31, 2001.  (T. 181-83; 139-40).

On August 14, 2001, Plaintiff reported that his pain was a 5 or 6 on a scale of 10; that he could not sleep; that recent injections in the neck had not helped but had increased his back stiffness; and that physical therapy had worsened the symptoms.  He was highly distressed with suicidal ideation and planned to shoot himself.  (T. 137).  On exam, he was disheveled, unshaven, thin, and appeared stressed.  He expressed anger at his nine years of pain therapy.  Dr. Nelson diagnosed chronic persistent multilevel pain with suicidal ideation.  He was transported to Mercy Hospital and "invited to return to MAPS after he...had been treated for his severe depression."  (T. 137-38).

Plaintiff saw Dr. Nelson at MAPS six times in Fall 2001.  (T. 151-52; 134-35; 149-50; 132; 128-29).  On September 11, Plaintiff was given intra-articular facet joint injections.  (T. 151-52). On September 25, he reported that he continued to work up to five hours a day with a sporadic schedule. (T. 134-35).  On exam, Dr. Nelson noted that cervical range of motion produced pain, and that his lumbar mobility was reduced.  On October 30, 2001, he was given medial branch blocks. (T. 149-50).  On November 15, he was given trigger point injections to the mastoid area.  (T. 132). On December 10, Plaintiff reported suffering headaches up to four times a week, lasting several hours a day.  Dr. Nelson stated that MAPS had "nothing else to offer the patient in terms of

treatment options for his persistent cervicalgia and headaches." (T. 128-29).

In February 2002, Plaintiff presented at MAPS with "persistent, severe and disabling" symptoms consistent with facet-mediated cervicalgia. (T. 146). Dr. Shultz administered diagnostic cervical medial branch blocks, and Plaintiff reported a post-procedure relief from pain. (T. 147).

On May 6, 2002, Dr. Nelson evaluated Plaintiff at MAPS regarding his ongoing pain symptomology. Plaintiff reported an increase in headaches and that he had been to the emergency room four times in the previous month and received injections of Demerol, Vistaril, and Troadol. He assessed that Plaintiff suffered persistent cervigalgia and possibly cluster headaches. (T. 124). He recommended Plaintiff use oxygen for 15 minutes at the onset of a headache.

A MAPS note dated July 7, 2003, states that Plaintiff had a Radiofrequency Nerve Ablation, a procedure which destroys the nerves that supply the facet joints in the spine, scheduled for August 19, 2003. (T. 395).

### 3.    Plaintiff's 2001 Hip Injury

On November 25, 2001, Plaintiff's alleged disability onset date, Plaintiff slipped on the ice and twisted his right hip. On December 19, 2001, Plaintiff saw Dr. Johnson with complaints of hip pain and depression. He reported suffering constant pain in the hip after his fall. Dr. Johnson referred Plaintiff to Orthopedics. (T. 175-76).

Plaintiff saw Dr. Johnson again on January 3, 2002. He reported that his hip pain was worsening and prevented him from working. Dr. Johnson noted he had a loud clicking when he moved. Dr. Johnson ordered a pelvic CT scan. (T. 174). The CT scan on January 7, 2002, showed no bony injury or soft tissue abnormality. (T. 203-04). On January 21, 2002, Plaintiff reported to

Dr. Johnson that his hip pain was very bad, that there was still a lot of clicking, and that he could barely walk.  (T. 168).

In May 2002, he presented to Dr. Johnson with hip strain.  He reported that his hip gives out after an hour of standing, and that he had not tolerated the Imitrex.  Dr. Johnson assessed chronic hip sprain, chronic headaches and neck strain.  (T. 155-56.)

On May 8, 2002, Plaintiff was evaluated by physical therapist Nancy Nichols at Dr. Johnson's referral.  (T. 220).  He reported that he had used crutches for a month after being evaluated in January 2002, but that his hip still popped and he suffered pain in the groin and right buttocks radiating down his leg.  Ms. Nichols assessed probable capsulitis and radiating symptoms from his low back.  She noted that he had a "very antalgic gait with decreased weight bearing on his right leg."  She evaluated that he suffered a dysfunction in the right hip due to longevity of poor pain control and method of ambulation.  She instructed him on cane use and prescribed a range of motion exercises and pain control for the hip joint.

An MRI of the pelvis and hips on May 28, 2002, for evaluation of right hip pain was considered negative.  (T. 198, 303).

On June 27, 2002, Dr. Johnson evaluated Plaintiff for a follow-up of his right hip pain.  (T. 298).  Dr. Johnson noted that Plaintiff walked with a limp and used a cane, and that his hip was very tender and that rotation caused most of the discomfort.  Dr. Johnson assessed hip capsulitis.  Dr. Johnson opined Plaintiff could "not stand long enough to do his work."  (T. 297).

Ms. Nichols prepared a physical therapy progress report on July 27, 2002.  (T. 218).  The report stated that Plaintiff was seen in physical therapy eight times from May 8, 2002, to June 7, 2002.  She reported that Plaintiff had right hip pain with a possible soft tissue capsular injury, and

that he ambulated with a very antalgic gait with a cane.  She noted he had a "consistent popping in his hip with release from full flexion," and that "when tested and retested, [he] had guarding and muscle spasms of the lumbar spine with decreased hip flexion."  She opined that he had "significant decrease of flexion which would not be of a range that would be functional."  He was discharged from outpatient physical therapy with a home exercise program.  (T. 218).

On July 24, 2002, Dr. Johnson reported no change in his hip condition and pain.  He noted that Plaintiff walked with a decided limp and used a cane.  He assessed chronic hip pain and wrote that Plaintiff would pursue physical therapy.  (T. 294).

On August 30, 2002, Plaintiff reported to Dr. Johnson that he still suffered a lot of discomfort from his hip, especially after standing.  He stated that he went school shopping with his daughter and after standing for two to three hours, he was fatigued and hardly slept that night.  He stated that he was working with physical therapy to strengthen his hip muscles.  Dr. Johnson noted that he walked with a limp and used a cane.  (T. 289).

On October 30, 2002, Plaintiff reported that any touching or rotation of the hip still caused pain.  Dr. Johnson noted that he walked with a limp and cane.  (T. 277).  Dr. Johnson diagnosed chronic right hip strain and prescribed Bextra.

On October 31, 2002, Plaintiff saw Dr. Anderson, an orthopedist, who noted he had seen him a year previously for hip pain.  Dr. Anderson wrote that Plaintiff had gotten somewhat better with therapy, but that he continued to have trouble with painful clicking and popping of the hip.  He wrote that Plaintiff occasionally could not walk and had "very significant symptoms."  On exam, he noted that Plaintiff had mild pain with motion of the hip, mostly in the groin area, which was "certainly suggestive of hip pathology."  (T. 275).

Dr. Johnson noted in April 2003, that there was no change in Plaintiff's hip condition.  In May 2003, Plaintiff reported his pain level was 7 on a scale of 10.  (T. 376-77; 373).

### 4.    State Agency Review and Dr. Golden's Evaluation of Plaintiff's Work Ability

In July 2002, Dr. Chisolm, the non-examining Social Security physician, reviewed the record evidence and concluded that Plaintiff could perform light exertional work.  He opined that due to his chronic pain and headaches, Plaintiff was limited to lifting 20 pounds occasionally and 10 pounds frequently, and that he should avoid frequent overhead motions.  (T. 208-215).  Dr. Wolfe, also a state agency physician, affirmed Dr. Chisolm's assessment.  (T. 215).

In January 2003, Dr. Golden, who treated Plaintiff's head and neck injury from 1991-1995, completed a physical exam and "Report of Work Ability" form.  (T. 326-28).  Dr. Golden noted that Plaintiff appeared very depressed, and that his examination revealed pronounced range of motion limitation in his neck, shoulders and lumbar spine, and left cervical spasm suboccipitally and trapezii bilaterally.  He wrote that the psychological impact of Plaintiff's 1991 head injury was substantial, and that "over the years, it has gotten substantially worse and has been treated, intensively, by multiple doctors."  He noted that Plaintiff had been on multiple medications over the years, but that the antidepressants had been ineffective or had caused significant side effects.  He wrote that Plaintiff manifested the prominent points in the chronic pain syndrome, and advised that Plaintiff continue MAPS and counseling with Dr. Loven, Plaintiff's psychologist.  Dr. Golden wrote that he had reviewed Plaintiff's 1991, 1992 and 1993 medical records, Dr. Loven's notes, Dr. Nelson's notes, and Dr. Dowdle's notes.  Dr. Golden diagnosed ongoing depression, migraine headaches, and preexisting bipolar disorder, which was manifested by the injury.  He concluded that, "clearly, [Plaintiff] was disabled from his injuries."  He wrote on the  "Report of Work Ability" that Plaintiff

was "fully disabled."

### C.    Medical Evidence - Mental Impairments

On February 7, 2002, Plaintiff was psychiatrically evaluated by David Adson, M.D., upon

Dr. Johnson's referral.  Plaintiff told Dr. Adson that he was bothered by constant anxiety and

restlessness.  He stated he had no ambition, appetite, libido, or interest in usual activities.  He had

poor memory and concentration.  He was chronically underweight and had crying spells, and felt

hopeless and at times suicidal, although not actively.  (T. 164).  Dr. Adson assessed that Plaintiff

suffered "unfortunately from a very treatment resistant chronic pain condition," associated with

"significant depression and anxiety and potentially attention deficit problems." (T. 165).  Dr. Adson

diagnosed major depressive disorder and generalized anxiety disorder versus adjustment disorder;

pain disorder; alcohol abuse versus dependence in full remission; chronic pain condition with

chronic headaches secondary to a work injury.  He gave Plaintiff a GAF score of 50.[2]  (Id.).

In May and June 2002, Andrine Lemieux, Ph.D., L.P., conducted a neuropsychological

evaluation of Plaintiff on referral from Plaintiff's psychologist Kate Loven, Ph.D., L.P.  (T. 308-17).

Plaintiff stated that he had been receiving psychotherapy from Dr. Loven since January 2002.

During the interview, he complained of severe depression, difficulty coping with chronic pain, and

frequent forgetfulness and confusion.  (T. 308-09).  Dr. Lemiex diagnosed chronic pain disorder

associated with psychological factors and a general medical condition; major depressive disorder,

single episode, severe without psychotic features.  (T. 315-16).  She wrote that attention deficit

---

[2]

The Global Assessment of Functioning (GAF) represents the clinician's judgment of the individual's overall level of
functioning.  On a scale from 0 to 100, a GAF of 10 represents "persistent danger of severely hurting self or others," and
a GAF of 100 represents "superior functioning in a wide range of activities."  A GAF of 41 to 50 represents "any serious
impairment in social, occupational, or school functioning," e.g., unable to make friends or keep a job.  See Pl. Mem. p.
33 n. 8, citing Diagnostic and Statistical Manual of Mental Disorders, 4th Ed. (1994) pp. 30-32.

hyperactivity disorder and schizotypal personality disorder were "rule-out" diagnoses.  She gave

Plaintiff a GAF score of 50.

In February 2003, Bradley Kuhlman, Ph.D., LP, conducted a pain management and

psychological evaluation of Plaintiff.  (T. 305-07).  He noted that Plaintiff presented "an extensive

history of chronic pain symptoms, depression and traumatic injury progressing to the present," and

that Plaintiff had "tried numerous conservative strategies without success," and wished to pursue

interdisciplinary services for management of his symptoms."  He diagnosed Plaintiff as suffering

from mood and pain disorders due to a general medical condition and psychological factors.  He

gave Plaintiff a GAF of 50-55.  (T. 306).  He recommended Plaintiff participate in a pain program

and referred him to Dr. Watkins.  (T. 307).

In April and June 2003, Plaintiff saw psychiatrist Dean Watkins.  (T. 389).  Dr. Watkins

noted that Plaintiff suffered ongoing mood problems, mainly irritability, related to pain.  In May

2003, Dr. Watkins completed a "Medical Opinion," in which he evaluated Plaintiff's mental ability

to perform work-related activities.  He indicated Plaintiff had good ability to perform 15 of 23 listed

mental activities, fair ability to perform 6 activities, and poor or no ability to perform the remaining

two activities - maintain concentration and perform at a competitive rate.  (T. 366-67).

Russell Ludeke, Ph.D., a state agency psychologist, reviewed the record evidence in

September 2002.  (T. 242-60).  Dr. Ludeke concluded that Plaintiff had depression characterized by

sleep disturbance and difficulty with concentration.  He noted that Plaintiff's psychiatric "problems

are on the borderline between non-severe and severe."  (T. 255).  He opined that Plaintiff could

understand and retain simple and detailed tasks and that he had adequate pace and persistence to

perform those tasks.  (T. 259).  He noted that Plaintiff should have brief and superficial contact with

public, peers, and supervisors, but that he could adapt to occasional, minor changes.

### D.  Plaintiff's Testimony

Plaintiff testified regarding his condition and impairments at the administrative hearing in July 2003.  (T. 420-442).  He stated that he lived with his wife and that he had no minor children. He stated that before November 2001, he had been performing contract transmission and driveline work. On November 25, 2001, he slipped on a patch of ice in his driveway, and that his hip popped and had been hurting ever since.  (T. 423-24).  He had not worked after that day, and had been receiving short-term disability insurance benefits since January 2002.

Plaintiff testified that he had been suffering from insomnia and mental health problems since his injury in 1991.  He stated that he currently weighed 130 pounds, but that before his accident in 1991, he weighed 165 pounds.  He attributed the weight loss to nausea, vomiting and pain, which stemmed from his headache medications.  (T. 436).  He stated that he experienced nausea all the time, and that he had experienced migraines since 1991.  He suffered approximately two to eight migraines a week, and stated that they had increased in intensity since 1991.  He stated that the headaches last from a couple of hours to three days.  He stated that during the major migraines he lays in a dark room, uses ice packs and oxygen, and takes Midrin, or goes to the emergency room for Demerol shots.  (T. 437).  He stated that he used oxygen on a daily basis.  (T. 438).

He stated that, because of the pain, he could only sleep four hours at a time and that he napped during the day.  (T. 439).  He stated that he could not maintain his concentration for two hours, and had difficulty reading and writing.  (T. 442).  He stated that he constantly experienced numbness in his hands that made it difficult to grasp objects.  (T. 439).  He stated that his wife helped him with showering and dressing, and that she "did everything around the house."  (T. 440).

-14-

He stated that even if he was cured of the pain arising from his 1991 accident, he would not be able to work because of his "condition" and "restrictions." (T. 430). He stated that his psychiatrist, Dr. Dean Watkins, prescribed him anti-depressants, and that he had been taking them for a month. (T. 433). He was also taking Vicodin, methocarbomal, Midrin, ibuprofen, Xanax, Baxtra, Ultra, Vistaril and oxygen. (T. 435). He stated that his treating physicians were Doctor Johnson and Doctor Golden. (T. 427).

### E.   Vocational Expert Testimony

Barbara Wilson-Jones testified as a neutral vocational expert ("VE") at the hearing. (T. 442). The ALJ asked the VE to consider whether Plaintiff could perform any of his past relevant work if he were limited to: lifting 20 pounds occasionally, and 10 pounds frequently; standing up to six hours and sitting up to six hours; avoiding frequent overhead motions; never using a ladder, ropes or scaffolding; and avoiding concentrated exposure to hazards, machinery and heights. The ALJ limited Plaintiff's ability to understand, remember and carry out detailed instructions; complete a normal work week without interruptions from pyschologically based symptoms; and get along with his co-workers. (T. 443-444). The VE testified that Plaintiff would not be able to perform his past work, but that he would be able to perform light, unskilled tasks, such as paper sorter, inspector, poly-pack heat sealer and deliverer. (T. 445-46).

The ALJ then posed a second hypothetical to the VE, in which he added the following additional psychological limitations: a psychological problem that warranted the person's absence from work on a more than four day a month basis, and interfered with concentration, attention, persistence and pace. The VE testified that a person with the second hypothetical characteristics would be unemployable. (T. 447).

F.     The ALJ's Decision

In determining whether Plaintiff was disabled, the ALJ followed the five-step sequential process outlined in 20 C.F.R. §§ 404.1520 and 404.920.[3]  In the first step of the analysis, the ALJ determined that Plaintiff had not engaged in substantial gainful activity after his alleged onset date of November 25, 2001.  (T. 16).

In the second step of the evaluation process, the ALJ determined whether Plaintiff suffers a severe physical impairment.  A severe impairment is one that significantly limits the individual's physical or mental ability to meet the basic demands of work activity.  20 C.F.R. §§ 416.920(c); 416.921.  The ALJ found Plaintiff suffered physical impairments of migraines, chronic pain syndrome, a history of head and neck injury, and hip strain and tendonitis.  Additionally, the ALJ found that Plaintiff suffered from the mental impairment of depression.  The ALJ found that though Plaintiff's attention difficulties were well documented in the record, he concluded that attention deficit hyperactivity disorder was not medically determinable.  (T. 16-17).

In the third step, the ALJ compared Plaintiff's physical impairments with the Listing of Impairments in Appendix 1 to Subpart F of the regulations.  (T. 16).  According to the regulations, if the required level of conditions is met, the claimant is found to be disabled without consideration of vocational factors.  The ALJ concluded that Plaintiff's impairments or combination of impairments were not medically equivalent to those in the Listing of Impairments.  (T. 16).  The ALJ similarly concluded that Plaintiff's depression, though severe, did not meet or equal the requirements of any section of the Listing of Impairments.  (T. 17-18).

---

[3]

Effective September 25, 2003, the Social Security Administration revised and reorganized the regulations at 20 C.F.R. §§ 404.1520 and 416.920.  68 Fed.Reg. 51153, 51161-62 (2003).  The modifications did not substantively alter the sequential evaluation process and the Court will cite the regulations that were in effect at the time of the ALJ's decision.

At the fourth and fifth steps of the evaluative process, the ALJ determined whether Plaintiff's RFC permits him to perform his past relevant work or any other work existing in significant numbers in the national economy.   The ALJ determined that Plaintiff had the RFC to lift and carry a maximum of ten pounds frequently and twenty pounds occasionally; stand for a maximum of six hours in an eight-hour day; and sit for a maximum of six hours in an eight-hour day.   The ALJ found, however, that Plaintiff could not perform frequent overhead motions; work on ladders or with hazardous machinery; that he could perform only simple-detailed tasks of three or four steps requiring no more than moderate concentration; and could tolerate only minor changes in the work place. (T. 18).

The ALJ found that Plaintiff could not perform his past relevant work as a transmission mechanic, deliverer and dishwasher.  (T. 21).  The ALJ found, however, that Plaintiff was capable of making a successful adjustment to work that exists in significant numbers in the national economy.  (T. 22).  As a result, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, at any time relevant to this adjudication.

### III.  STANDARD OF REVIEW

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence on the record as a whole.  See 42 U.S.C. § 405(g);  Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998); Gallus v. Callahan, 117 F.3d 1061, 1063 (8th Cir. 1997); Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989).  Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See Jackson v. Apfel, 162 F.3d 533, 536 (8th Cir. 1998); Black v. Apfel, 143 F.3d 383, 385 (8th Cir. 1998). In determining whether evidence is substantial, a court

must also consider whatever is in the record that fairly detracts from its weight.  See Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999); see also Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989) (citing Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence would have supported an opposite decision.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000) (internal citations omitted); Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996).  Therefore, our review of the ALJ's factual determinations is deferential, and we neither re-weigh the evidence, nor review the factual record de novo.  See Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

## IV.  CONCLUSIONS OF LAW

### A.    The ALJ Incorrectly Rejected the Opinions of Plaintiff's Treating and Examining Physicians

Plaintiff argues that the ALJ improperly weighed the opinions of Drs. Watkins and Golden in determining his RFC.  See Pl's Mem. pp. 33-34; Pl.'s Rep. Mem. pp. 3-5.  Defendant argues that the ALJ properly weighed the physician, psychologist, and psychiatric opinions in the record, and reasonably concluded Plaintiff could perform a range of light work.  The Court finds that the ALJ erred by substituting his opinion for medical evidence and by relying too heavily on the opinions of the non-examining agency physicians, and that as a result, the RFC determination is not supported by substantial evidence.

The ALJ determined Plaintiff had the RFC to lift ten pounds frequently and twenty pounds occasionally, stand for six hours in an eight-hour day, perform simple-detailed tasks that required moderate concentration, and tolerate minor changes in the work place.  In determining Plaintiff's RFC, the ALJ rejected Dr. Golden's 2003 opinion that Plaintiff was fully disabled.  In January 2003,

-18-

Dr. Golden, who had treated Plaintiff's head injury from 1991 to 1995, physically examined Plaintiff and evaluated his work ability.  As part of the evaluation, he reviewed his treatment records from Plaintiff's head injury, and the notes of Dr. Loven, Dr. Nelson and Dr. Dowdle.  On exam, he noted that Plaintiff appeared very depressed and suffered limited range of motion in his neck, shoulders and spine.  He diagnosed chronic pain syndrome, ongoing depression, migraine headaches and bipolar disorder.  He wrote that the psychological impact of Plaintiff's 1991 head injury was significant, that it had substantially worsened, and been treated intensively by multiple doctors.  (T. 326-28; supra p. 11).

The ALJ rejected Dr. Golden's opinion after finding it unsupported by objective evidence. (T. 19-20).  The ALJ noted that Dr. Golden's treatment notes from 1994 and 1995 indicated he did not believe Plaintiff to be disabled at that time.  The ALJ rejected Dr. Golden's 2003 opinion that Plaintiff was fully disabled because "Dr. Golden did not indicate what medical evidence he relie[d] on to make such a dramatic change in his opinion of [Plaintiff's] ability."  Defendant argues that the ALJ reasonably declined to grant great weight to Dr. Golden's opinion because it was conclusory. See Def. Mem. p. 9.

The Court disagrees.  Dr. Golden examined Plaintiff in 2003 and found him "completely disabled."  The record contains his contemporaneous opinion letter, in which he documented Plaintiff's depression and limited range of movement.  Dr. Golden explicitly noted that in making his determination, he reviewed the records of Plaintiff's other treating physicians – Drs. Loven, Dowdle, and Nelson.  Even if Dr. Golden's findings were conclusory, the ALJ had a duty to develop the record regarding his opinion.  See Bowman v. Barnhart, 310 F.3d 1080, 1082-85 (8th Cir. 2002).

In Bowman, the record contained treatment records and a letter listing the claimant's

impairments and medications from the claimant's treating physician.  The ALJ, however, did not

rely on the records and letter because they were cursory.  The Eighth Circuit held that the ALJ erred

by rejecting the records and letter.  Instead, the ALJ was obligated to contact the physician, who had

treated the claimant for thirty years, "for additional evidence or clarification," and for an assessment

of how the impairments limited the claimant's ability to engage in work activities.  Id. at 1085,

quoting 20 C.F.R. § 404.1512(e) (other citations omitted).   Here, Plaintiff received extensive

treatment from Dr. Golden beginning in 1991.  Throughout the early nineties, Dr. Golden managed

the care Plaintiff received at the Noran Neurological Clinic.  In 2003, after a thorough review of

Plaintiff's records and a physical examination, he concluded Plaintiff was fully disabled.  The ALJ

erred by rejecting Dr. Golden's opinion.  If the ALJ believed his opinion of disability was

conclusory, he was obligated to contact him for additional clarification.

> 1.    **The ALJ May Not Rely Exclusively on the Opinions of Non-Examining Agency Physicians in Determining Plaintiff's Ability to Stand or Concentrate**

Instead of developing the record from Dr. Golden and Plaintiff's other treating and

examining physicians, the ALJ improperly relied on the reports of state consultants who did not

examine Plaintiff.  It appears to the Court that the only evidence that supports the ALJ's

determination that Plaintiff can stand for six hours a day is the opinion of agency physician Dr.

Chisolm.  Drs. Johnson and Anderson, Ms. Nichols (Plaintiff's physical therapist), and Dr. Knafla

(Plaintiff's chiropractor) noted in their treatment notes that Plaintiff suffered painful clicking and

popping, and walked with an antalgic gait with the aid of a cane.  Drs. Johnson and Knafla opined

that Plaintiff could not stand to perform work.

Dr. Chisolm never examined Plaintiff and provided his opinion that Plaintiff could stand up

to six hours a day solely based on the medical records.   Dr. Chisolm indicated in his recommendation that the record he reviewed contained no statements from treating or examining sources. (T. 214).   Relying upon a non-examining, non-treating physicians to form an opinion on a claimant's RFC does not satisfy the ALJ's duty to fully and fairly develop the record.   Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).   Given the contradictory recommendations and the insufficiently developed record surrounding Plaintiff's hip condition, Dr. Chisolm's opinion does not constitute substantial record evidence that Plaintiff can stand for six hours and perform light work.   See id. ("The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole") citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999).

Similarly, it appears to the Court that Dr. Ludeke's report is the only evidence in the record that supports the ALJ's determination that Plaintiff has the concentration and attention ability to perform simple tasks at a competitive pace.   Upon examination, two reviewing psychologists and two reviewing psychiatrists documented Plaintiff's attention difficulties.   Drs. Adson, Lemieux and Kuhlman gave Plaintiff a GAF of 50, which represents that Plaintiff's suffers from a serious impairment in social or occupational functioning that prevents him from maintaining a job.   Their opinions coincided with Dr. Watkins' assessment that Plaintiff lacked the ability to maintain attention for longer than two-hour periods, and was unable to perform at a competitive rate.   Dr. Ludeke's assessment is the only evidence that supports the ALJ's determination that Plaintiff can perform simple tasks at a competitive rate.   Dr. Ludeke never examined Plaintiff and provided his RFC opinion solely on Plaintiff's medical records.   Given the contradicting assessments in the record, Dr. Ludeke's opinion does not constitute substantial record evidence that Plaintiff can

perform at a competitive rate.  See id.

In sum, the ALJ's RFC conclusions are not supported by substantial record evidence. Specifically, the ALJ erred by rejecting the opinions of Plaintiff's reviewing and examining physicians, and by placing too much weight on the opinions of the agency reviewing physicians. Even if the ALJ properly rejected the opinions of Plaintiff's treating physicians, the ALJ erred by depending upon the equally conclusory opinions of the state agency physicians who never examined Plaintiff.  See id. ("An [ALJ] may not draw upon his own inferences from medical reports") (quotation omitted); Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004) (RFC is a medical question, and an ALJ's finding must be supported by some medical evidence).

The record is undeveloped regarding what specifically Plaintiff's treating and examining physicians recommended in terms of his ability to stand and his mental ability to perform at a competitive rate.  A more complete record, with sufficient medical evidence and opinions regarding Plaintiff's physical ability to stand, and his mental ability to concentrate and perform competitively, needs to be developed to ascertain what work, if any, Plaintiff is able to perform.   Accordingly, the case should be remanded for further proceedings to more fully develop the record.  Upon remand, the ALJ should seek detailed opinions from Plaintiff's physicians regarding his ability to stand and concentrate, or in the alternative, the ALJ should order consultative examinations to assess Plaintiff's physical and mental RFC.  See id.[4]

## V.  RECOMMENDATION

Based on the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED**

---

[4]

Because the Court concludes that the ALJ's RFC determination is unsupported by substantial evidence the Court need not address Plaintiff's claim that the ALJ failed to properly analyze his credibility under Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

that:

1.      Plaintiff's Motion for Summary Judgment [#8] be **DENIED**;

2.      Defendant's Motion for Summary Judgment [#12] be **DENIED**; and

3.      The Commissioner's decision should be **REVERSED** and the case **REMANDED** for further administrative proceedings consistent with this Report and Recommendation.  On remand, the Commissioner is directed to fully develop the record to determine the extent of the Plaintiff's physical ability to stand, and his mental ability to perform competitively.

DATED: August 5, 2005              s/ *Franklin L. Noel*          
                                      FRANKLIN L. NOEL
                                      United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **August 24, 2005**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.